IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT YOUNG, | ) | |
| | ) | Case No. 3:12-cv-0261 |
| Plaintiff, | ) | Judge Aleta A. Trauger |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

The defendant, United Parcel Service, Inc. ("UPS"), has filed a Motion for Summary Judgment with a supporting memorandum (Docket Nos. 21-22), to which the plaintiff has filed a Response in opposition (Docket No. 37), and the defendant has filed a Reply (Docket No. 40). For the reasons discussed herein, the defendant's motion will be granted.

## BACKGROUND[1]

### I.    Overview

Defendant UPS employed plaintiff Robert Young, an African-American, from January 1998 until his termination on March 23, 2011. UPS is a global package delivery company. In this lawsuit, Young alleges various federal and state law claims against his former employer. All of Young's claims relate to disciplinary action taken against him prior to his termination,

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed facts (Docket No. 23), the plaintiff's responses thereto (Docket No. 35), and the exhibits filed in support of the parties' submissions (Docket No. 21, Exs. A-E; Docket Nos. 25-34, Docket No. 40, Exs. A-H). The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

1

including his assignment to a management performance improvement plan that ultimately led to his termination in March 2011. Specifically, Young alleges claims of (1) interference and retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); (2) disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); (3) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), (4) state law retaliatory discharge and a violation of the Tennessee Public Protection Act, T.C.A. § 50-1-304 (2008) ("TPPA"), related to Young's whistleblower report of a safety violation; and (5) common law negligence for the hiring, supervision, and retention of the alleged perpetrator of discrimination.

## II.  Factual Background

### A.  Overview

Between 2004 and his termination in 2011, Young was employed as a warehouse supervisor at UPS's Material Distribution Center (the "MDC"). The MDC "picks and packs" automotive parts for UPS's fleet of automobiles. It is the only such operation in the United States. (Docket No. 33 at 12-13.) Until his termination, Young was responsible for supervising various employees and employee operations, including the pack lane and the pick lane. Young worked at the MDC with Amiya Simmons, who was also a warehouse supervisor and later became his boss. Simmons identifies as African-American, although Young testified at his deposition that he believed Simmons to be Asian. In January 2006, Maria Cacho began working at the MDC as its Division Manager. Cacho identifies as Portuguese; both Young and Simmons testified that Cacho is Caucasian.

After Cacho's arrival at the MDC in 2006, she moved Young temporarily to the administrative side of operations "to assist him in developing the skills required for a management employee."[2] (Docket No. 35 ¶ 7.) These skills included "leadership and motivational skills, trust and respect, demonstrating tasks to a level considered acceptable, and taking ownership of his actions." (*Id.*) After approximately six months to one year, Cacho returned Young to the warehouse in 2007. Upon his return to the MDC, Young was supervised directly by Simmons, who had been promoted to Warehouse Manager by Cacho. In 2008, Simmons testified that he had concluded that Young had performance deficiencies that Simmons believed could be corrected through training and coaching.[3]

### B. Young Requests FMLA Leave

In March 2010, Young applied for FMLA leave for a health condition related to his eyes. (Docket No. 34, Ex. A at 69.) UPS approved the application.[4] On July 6, 2010, Young signed a second request for FMLA leave for irritable bowel syndrome. (Docket No. 34, Ex. A at 78-80.) Cacho received notification of Young's July FMLA request, but the notification did not contain Young's medical diagnosis or the reason that he requested leave.

### C. Young's MPIP Plan

---

[2] Cacho testified that Young was moved to the administrative side of operations after Cacho received several complaints from other employees regarding Young. Young denies that there were any complaints made to Cacho but admits that he was moved to operations to work on "MSDS compliance issues and some training skill sets."

[3] The parties dispute whether Simmons addressed his concerns with Young, although it is undisputed that no disciplinary action was taken against Young in 2008.

[4] It is undisputed that Young received approval for every FMLA request he submitted throughout his employment. Young testified that, prior to 2010, he had requested and been granted FMLA leave to help a family member suffering from an illness.

3

On July 9, 2010, Simmons, Young, and Harry Wilson, UPS's Human Resources Area Director, met to discuss Simmons' recommendation that Young be placed on a management performance improvement plan ("MPIP"). UPS uses MPIPs for management employees who are not meeting their goals and objectives as a method to teach employees about their deficiencies and improve their performance. The typical MPIP includes reviews every 30 days, beginning one month after the start of the MPIP and continuing through 90 days, although the reviews may vary based on schedules. UPS may use its discretion to extend an MPIP beyond 90 days depending on the employee's circumstances, such as whether the opportunity for improvement still exists.

Simmons testified that he placed Young on the MPIP because Young was not meeting his performance expectations. (*See* Docket Nos. 33, 35.) Both Cacho and Wilson agreed with Simmons' recommendation to place Young on an MPIP. Simmons was in charge of determining what Young's MPIP goals and objectives would be. Simmons identified three categories for Young to improve upon: (1) information integrity and time card errors, (2) service failures and order delays, and (3) manage service jams and create pick balance. Young was warned in his July 9, 2010 meeting that, if he failed to successfully complete his MPIP, he might not receive a recommendation for a 2010 Management Incentive Program bonus or a merit increase in 2011, and that he might be subject to disciplinary action, up to and including discharge.

**D. October 2010 FMLA Request**

At some point in October 2010, Young submitted a third request for FMLA leave related to sleep apnea. However, Young withdrew his request before UPS rendered a decision.

**E. Young's MPIP Reviews**

4

As of Young's 90-day MPIP review on October 25, 2010, Simmons concluded that Young had failed to meet the performance expectations of the MPIP. Consequently, after the review, Simmons recommended to Cacho that Young be terminated. The plaintiff does not dispute that such a recommendation was made, but he contends that "Simmons' recommendation for termination at that time, if it occurred, was based on an illegal motive," including Young's prior request for FMLA leave, his disabilities, and/or his race. (Docket No. 35 ¶ 14.) Young disputes the "accuracy of the information" used by Simmons to determine Young's progress and the expectations set by the MPIP. Young further alleges that he felt that, although he was not "perfect" in the areas measured by his MPIP, he thought that he had no more errors than other employees at his level.

Despite Simmons' recommendation for termination, Young's MPIP was extended for what appears to be an uncertain amount of time. The parties dispute the reason for this extension. Simmons testified at his deposition that he presented his recommendation for termination to Wilson in October 2010, but that Wilson recommended extending Young's MPIP to give Young additional time to improve. Young argues that he was unaware of this extension until December 2010, but he does not allege that he was given any information as to the status of his MPIP in terms of its completion or its extension. It appears undisputed that Simmons and Young did not meet to review Young's MPIP progress in November 2010.

### F. Young's Injury at the MDC

On December 9, 2010, Young hit his head on a piece of machinery while working at the MDC. On the day of his injury, Young submitted a workers' compensation claim. On December 13, 2010, Young sent an email to Cacho and Simmons to advise them of his injury and express his concerns regarding the safety of the area of the MDC where he had hit his head.

5

On December 14, 2010, Simmons met with Young to conduct an additional MPIP review. At this meeting, Simmons told Young that the MPIP would continue until the human resources department came to a decision.

After his injury, Young was able to return to work subject to physician-imposed restrictions, including (1) no lifting over 20 pounds, (2) no pushing or pulling over 20 pounds of force, (3) no driving or operating heavy machinery, and (4) no climbing. On January 18, 2011, Young's restrictions were updated to: (1) no driving; (2) no stooping or bending; (3) no heights; and (4) no hazardous activities. Young's physician further limited Young to working eight hours per day and directed him to avoid high noise levels.

Simmons met with Young for another performance review on February 7, 2011. Simmons testified that, following Young's injury in December 2010, Young was unable to perform many of his prior duties and, therefore, Simmons was unable to perform a comprehensive review in February based on the criteria set forth in the original MPIP.

On March 23, 2011, UPS terminated Young. Wilson, Simmons, and Cacho testified that Young's termination was based solely upon his poor work performance and failure to improve, despite the many opportunities for improvement granted to him by UPS. Young avers that a successful completion of his MPIP was "unattainable" and instead, UPS terminated him for discriminatory reasons. Young further alleges that Cacho and Simmons were motivated by an illegal bias to terminate Young from his employment.

### G. Young Files an EEOC Action

On February 7, 2011, Young completed an intake questionnaire for the Equal Employment Opportunity Commission ("EEOC") related to his termination. Young wrote on the questionnaire that he had never requested a reasonable accommodation for a disability. He

also claimed that he no longer had a disability but listed "glaucoma" and "sleep apnea" as the disabilities that he believed were the reason for his discharge. He filed a charge against UPS with the EEOC on April 27, 2011, alleging race, age, color, and disability discrimination and retaliation. It is undisputed that, prior to Young's termination, neither Cacho nor Wilson knew that Young had planned to file or had filed an EEOC charge.

## III.    Procedural Background

Young filed this action on February 23, 2012, in the Circuit Court for Davidson County, Tennessee. (Docket No. 1, Ex. 1.) UPS removed the action to this court on March 12, 2012, pursuant to 28 U.S.C. § 1441. (Docket No. 1.) On June 5, 2012, Young filed an Amended Complaint. (Docket No. 10.) UPS answered the Amended Complaint on June 19, 2012 (Docket No. 11), and on July 8, 2013, it filed the pending motion for summary judgment (Docket No. 21).

## ANALYSIS

## I.    Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving

7

party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.       The *McDonnell Douglas* Analysis

As an initial matter, six of Young's eight claims are analyzed employing the familiar burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). These claims include Young's FMLA interference and retaliation claims, workers' compensation retaliation claim, disability discrimination claim, race discrimination claim, and both of his whistleblower claims.

The *McDonnell Douglas* framework is properly used where a plaintiff uses indirect or circumstantial evidence to demonstrate that an employer acted with a retaliatory or discriminatory motive. If the plaintiff makes a *prima facie* showing, "the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007). To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Id.*; *see also Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th

8

Cir. 2008). If the defendant is successful, the burden then "shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination." *Bryson v. Regis Corp.,* 498 F.3d 561, 570 (6th Cir.2007). To make this showing, Young retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

The elements of a *prima facie* case for the various individual claims are discussed below.

### III.     FMLA Claim

The FMLA provides that an eligible employee is entitled to up to twelve weeks of medical leave in a year in the event of "'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (quoting 29 U.S.C. § 2612(a)(1)(D)); *see also Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003). The Sixth Circuit recognizes two theories for recovery under the FMLA: "the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2)." *Id.*

#### A.  Interference Claims under the FMLA

The FMLA makes it illegal for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). Consequently, if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).

A plaintiff must establish a *prima facie* case of FMLA interference by demonstrating five elements: "(1) [he] was an '[e]ligible employee'; (2) the defendant was an '[e]mployer' covered

9

under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of [his] intention to take leave; and (5) the employer denied the employee FMLA benefits to which [he] was entitled." *Wysong*, 503 F.3d at 447 (quoting *Cavin*, 346 F.3d at 719); *see also Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). The employee must establish these elements by a preponderance of the evidence. *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 335 (6th Cir. 2005) (citing *Cavin*, 346 F.3d at 719). Regulations interpreting the FMLA explain that interference includes, "for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b) (2013); *see also Arban*, 345 F.3d at 402.

"Because the relevant issue is whether the employer provided the employee with the entitlements provided by the FMLA, an employer may violate Section 2615(a)(1) regardless of the intent behind its conduct." *Ritenour v. Tenn. Dep't of Human Servs.*, 497 F. App'x 521, 530 (6th Cir. 2012). However, because the Sixth Circuit has recognized that "the FMLA is not a strict-liability statute, the mere occurrence of interference with an employee's FMLA rights is not a *per se* FMLA violation." *Id.* (internal citations omitted). If an employer demonstrates a legitimate reason unrelated to the exercise of FMLA rights for taking adverse action against the employee, the plaintiff must rebut the employer's reason by showing that the proferred reason had (1) no basis in fact, (2) did not motivate the adverse employment action, or (3) was insufficient to warrant the adverse employment action. *Id.* (citing *Donald*, 667 F.3d at 672); *see also Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008).

### B. Young's Interference Claim

Pursuant to the *McDonnell Douglas* analysis, Young must first demonstrate a *prima facie* claim of interference. The first four elements of Young's *prima facie* interference claim are undisputed; solely at issue is whether UPS denied Young his entitlements under the FMLA.

UPS points out that it is undisputed that UPS granted Young all the FMLA leave he requested. For the first time in the record, Young asserts in his opposition to UPS's motion that UPS interfered with his FMLA rights by "discouraging" him from taking FMLA leave in October 2010.[5] Young submits that, after being denied an annual raise after his March 2010 FMLA request and being placed on the MPIP following his July 2010 FMLA request, Young "reconsidered and subsequently withdrew" his October 2010 FMLA request. (Docket No. 38 at 5.). Young fails to submit any evidence to support this allegation of discouragement, not even his own sworn testimony. Consequently, Young has failed to establish the elements of his *prima facie* case and his FMLA interference claim must be dismissed.

### C. Retaliation Claims under the FMLA

Young also claims that UPS's actions constitute unlawful retaliation in violation of the FMLA. The FMLA makes it illegal for an employer "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA.]" 29 U.S.C. § 2615(a)(2). In order to make out a *prima facie* case of retaliation, the plaintiff must show that: (1) he availed himself of a protected right under the FMLA, (2) he was adversely affected by an employment decision, and (3) there was a causal connection between the exercise of the right and the adverse employment decision. *Skrjanc v. Great Lakes Power Serv.*, 272 F.3d

---

[5] When asked about the withdrawal of his October FMLA request in his deposition, Young testified that he withdrew the application, without further elaboration. (Docket No. 40, Ex. 1 at 216.)

309, 314 (6th Cir. 2001). As is the case with an interference claim, employers may not "use the taking of FMLA leave as a negative factor in employment actions." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).

Causation can be proved directly or inferentially. When, as here, causation is based on circumstantial evidence, courts use the three-step *McDonnell Douglas* analysis. *Donald*, 667 F.3d at 762.

### D. Young's FMLA Retaliation Claim

Only the third element of Young's FMLA retaliation claim is in dispute. UPS argues that Young fails to show a causal connection between his FMLA leave and his discharge, and, therefore, fails to set forth a *prima facie* case for retaliation.

#### 1. Causal Connection

Young submits a mix of indirect evidence and conclusory allegations in an attempt to demonstrate a causal connection between his FMLA leave and the MPIP that led to his termination. Young asserts that a connection exists because of (1) the temporal relationship between his July FMLA request and the initiation of the MPIP a few days later; (2) the fact that Cacho and Simmons were aware that Young had taken FMLA leave; and (3) Young's testimony that he "had no disciplinary or improvement plans in place before he applied for FMLA in 2010." Young also alleges that, at some point in time, he approached his supervisor, Simmons, regarding his medical issues and that Simmons remarked, "Robert, I think you need to commit yourself more to your job."[6] (Docket No. 21, Ex. A at 127.) A plaintiff's burden in establishing a *prima facie* case is not intended to be an onerous one. *Skrjanc*, 272 F.3d at 315. Accordingly,

---

[6] Simmons does not recall making such a statement. (Docket No. 33 at 165.)

the court concludes that Young's allegations are sufficient to make out a *prima facie* case for retaliation.[7]

### 2. Legitimate Non-Discriminatory Reason

UPS asserts that Young's poor performance was the sole reason for the disciplinary action taken against him, including the denial of his raise, the initiation of the MPIP, and his discharge. Here, Young's shaky performance record, both prior to and during his MPIP, is well-documented. UPS has met its burden of presenting a legitimate non-discriminatory reason for initiating the MPIP that led to Young's termination.

### 3. Pretext

The burden then shifts back to Young to demonstrate that the defendant's legitimate reason is pretextual or unworthy of belief. Young may do so by demonstrating that UPS's proffered reason has (1) no basis in fact, (2) did not motivate the adverse employment action, or (3) was insufficient to warrant the adverse employment action. Whichever method the plaintiff employs, he bears the burden of producing "sufficient evidence from which the jury could

---

[7] The defendant relies on two cases for its proposition that Young must provide "sufficient evidence that, if true, might reasonably show that the exercise of his FMLA rights was a 'motivating factor' in his discharge" in order to demonstrate the causal connection prong of Young's *prima facie* case. The court notes that, upon examination, neither of the cases cited by UPS supports the defendant's suggested standard for the "causal connection" prong. *See Heady v. U.S. Enrichment Corp.*, 146 F. App'x 766, 769-70 (6th Cir. 2005) (holding that plaintiff had demonstrated causal connection simply by demonstrating proximity in time between a request for FMLA-protected leave and discharge for purposes of a *prima facie* case); *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (finding in a Title VII case that a plaintiff had not presented sufficient evidence of a causal connection where he did not present specific dates or incidents in which he was denied a promotion); *see also Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (temporal proximity is sufficient to demonstrate causal connection between protected activity and adverse employment action for purposes of setting forth a *prima facie* case).

reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him." *See Clark*, 424 F. App'x at 474. Young does not appear to argue that his performance issues had no basis in fact. Instead, he argues that (1) his performance did not motivate UPS to place him on an MPIP and ultimately terminate him, and (2) his performance issues were insufficient to warrant the adverse employment action. The latter assertion must be demonstrated by Young's showing that he was treated differently from similarly situated, non-minority employees. For his FMLA retaliation claim to survive summary judgment, Young must demonstrate that a genuine issue of material fact exists as to pretext.

        i.    *Motivation*

Young submits three pieces of evidence in support of his contention that his performance did not motivate the adverse employment actions taken against him: (1) allegedly conflicting testimony from Simmons and Cacho regarding what temporal period of Young's employment was considered in the decision to terminate him; (2) the temporal proximity of UPS's decision to initiate the MPIP and Young's FMLA leave; and (3) Young's allegation that Simmons, in a conversation about Young's medical issues, told Young that he needed to "commit" more to his job. First, upon review of the testimony cited by Young, the court concludes that the allegedly conflicting testimony from Cacho and Simmons has no bearing on the issue of pretext.[8] Next, it is well-settled that close temporal proximity of requests for FMLA leave and an adverse

[8] Young's assertion that the testimony of Simmons and Cacho is in conflict is inaccurate. Simmons testified in the EEOC Hearing that a decision to terminate Young was based on his job performance prior to December 2010 because, after December 2010, Young was unable to perform many of his job responsibilities and, therefore, his supervisors were unable to evaluate him fully. Simmons' deposition testimony regarding Young's termination is consistent with this, as is Cacho's testimony that the entire duration of Young's performance throughout the MPIP was considered by UPS when deciding to terminate Young.

14

employment action alone "cannot be the sole basis for finding pretext." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012). Accordingly, for Young's retaliation claim to survive summary judgment, the alleged statement made by Simmons and the temporal proximity of his FMLA leave and the MPIP must create a genuine issue of material fact as to the motive of UPS in placing Young on his MPIP.

The plaintiff has failed to meet his burden. As an initial matter, Young's self-serving testimony is the only evidence that Simmons made such a statement. Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment. *Anderson*, 477 U.S. at 248. Further, the bulk of the record contradicts Young's allegation that Cacho and Simmons were conspiring to fire Young; instead, it reveals that UPS gave Young several opportunities to improve his performance, including granting him multiple extensions of the MPIP. The alleged statement made by Simmons does not overwhelm the great weight of evidence concerning Young's declining performance. Moreover, the only evidence attempting to rebut UPS's record of poor performance is Young's own testimony; other witnesses, including Ralph Maxson, another warehouse supervisor, confirm that Young's performance was an issue. Without more, Young's self-serving statement and his allegations of temporal proximity are insufficient to demonstrate that a material issue of genuine fact exists as to pretext.

ii. *Similarly Situated Employees*

The FMLA protects Young's right to be treated the same as other similarly situated employees. *Skrjanc*, 272 F.3d at 317. Accordingly, if Young can show that similarly situated and similarly skilled employees who engaged in identical performance to Young were not placed on an MPIP and ultimately terminated, then he may raise a reasonable inference that he was treated dissimilarly because he had invoked his rights under the FMLA. For a comparator to be

15

considered "similarly situated," the plaintiff is required to prove that all of the relevant aspects of his employment situation are "nearly identical" to those of the non-minority's employment situation. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Young has submitted five other employees as comparators: Ralph Maxson, Emery Stutesman, Kelli Mullins, Sue Drummond, and Brandon McDonald. Mullins is African-American and is therefore not considered as a non-minority comparator for purposes of showing discrimination against Young. The record is very scant as to information regarding McDonald and Drummond, who were transferred to other departments at some point during Young's employment. Accordingly, the court will focus its analysis on Maxson and Stutesman, who are both Caucasian and who worked as warehouse supervisors under Simmons' supervision at the MDC.

Young has failed to show that either Maxson or Stutesman possessed a "nearly identical" employment situation to Young's. Cacho testified that, although both Stutesman and Maxson had time card errors indicated as a place for improvement on their quarterly reviews (like Young), both employees improved their performance and met their goals. (Docket No. 31 at 58.) Additionally, Maxson testified that, although he had received disciplinary admonishments during his employment (including a denial of an annual raise), he had never been placed on an MPIP because he had improved in areas highlighted in his quarterly reviews. (*See generally* Docket No. 30.) Moreover, other than the time card error noted on Stutesman's quarterly review, Cacho did not recall any other concerns about performance related to Stutesman. Similarly, although Cacho recalled some training concerns related to Maxson, she testified that Maxson's performance had improved with coaching and was now satisfactory. (*Id.* at 92-93.) Simmons corroborated Cacho's testimony.

16

On the other hand, Young does not dispute that he did not improve during his MPIP, nor does he dispute that his performance issues were well-documented by UPS. Although Young attempts to dispute whether the goals set for him were attainable, he has presented no compelling evidence, beyond his own self-serving testimony, that the objectives of the MPIP were so unattainable as to be pretext for discrimination. In conducting its analysis, the court is not "intended to act as [a] 'super personnel [department]' to second guess an employer's facially legitimate business decisions." *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006).

Young has failed to present examples of similarly situated non-minority comparators to demonstrate pretext and, therefore, has failed to show that a genuine issue of material fact exists as to pretext. Accordingly, summary judgment is appropriate for UPS on Young's FMLA claims.

## IV.    Workers' Compensation Retaliation Claim

### A.  Tennessee Workers' Compensation Retaliation Claim

Tennessee statutes protect employees from discharge because of their race, religion, sex, age, physical condition, mental condition, and, by ruling of the Tennessee Supreme Court, from discharge in retaliation for asserting a workers' compensation claim. *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984) (interpreting T.C.A. § 50-6-114 and concluding that the statute regarding employment contracts "evidences a clear public policy" that employees should be protected from having their employment terminated from asserting a workers' compensation claim); *see Anderson v. Standard Register Co.*, 857 S.W.2d 555, 556-57 (Tenn. 1993), *overruled on other grounds as recognized by Perkins v. Metro Gov't of Nashville*, 380 S.W.3d 73, 79 n.8 (Tenn. 2012); *see also Cobb v. Keystone Memphis, LLC*, 526 F. App'x 623, 626 (6th Cir. 2013)

17

(explaining the Tennessee courts' recognition of a common-law claim of retaliatory discharge); *Brasfield v. Martinrea Fabco Automotive Structures (USA), Inc.*, No. 3:11-1134, 2013 WL 2644410 (M.D. Tenn. June 12, 2013) (analyzing plaintiff's common law claim of retaliatory discharge following filing of workers' compensation claim), *report and recommendation adopted*, 2013 WL 3335088 (M.D. Tenn. July 2, 2013).

In order to make out a *prima* facie case for retaliatory discharge, a plaintiff must prove that (1) he was an employee of the defendant at the time of the injury; (2) he made a claim against the defendant for workers' compensation benefits; (3) the defendant terminated his employment, and (4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate his employment. *Anderson*, 857 S.W.2d at 558. The first three elements are not in dispute. As Young fails to provide evidence that his workers' compensation claim was a substantial factor in his termination, however, the court will grant UPS summary judgment on Young's common law retaliatory discharge claim.

To demonstrate that Young's workers' compensation claim was a "substantial factor" in his termination, Young must either show direct or "compelling circumstantial evidence" of a causal connection between the workers' compensation claim and his termination. *Brasfield*, 2013 WL 2644410, at *3; *see also Reed v. Alamo Rent-a-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999). The Tennessee Court of Appeals has offered guidance about what types of evidence satisfy this standard:

> [A] plaintiff cannot establish causation by testifying that [he] cannot think of any other reason for [his] discharge. The plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship.
>
> Moreover, a plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between [his] on-the-job injury and [his] subsequent discharge. Instead, the plaintiff must show that [his] claim for

18

workers' compensation benefits, as opposed to [his] injury, was the true or
substantial reason for [his] discharge.

*Reed*, 4 S.W.3d at 685.

As courts have emphasized that the cause of action for retaliatory discharge is "a narrow
exception to the employment at will doctrine," the evidence of causation must be compelling.
*Abraham v. Cumberland-Swan, Inc.,* No. 01A01-9201-CH-00032, 1992 WL 207775, at *3
(Tenn. Ct. App. Aug. 28, 1992). As such, courts have consistently held that temporal proximity
between the claim and the termination is not by itself sufficient. *See, e.g.*, *Conatser v.
Clarksville Coca-Cola Bottling Co.,* 920 S.W.2d 646, 648 (Tenn. 1995) (holding that the fact that
plaintiff was fired three weeks after receiving workers' compensation was not sufficient evidence
of a causal relationship).

While not alone sufficient, as with Young's FMLA retaliation claim, "temporal proximity
plus other circumstantial evidence of causation" can present a *prima facie case* for retaliation
under Tennessee law. *Craig v. Porter Cable/Delta*, No. 1:05-1018, 2006 WL 1006857 , at *8
(W.D. Tenn. Apr. 17, 2006) (citing *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997)). In
*Newcomb v. Kohler Co.*, the Tennessee Court of Appeals set forth a variety of factors that,
together with temporal proximity, could present sufficient circumstantial evidence of causation,
including "the expression of a negative attitude by the employer toward an employee's injury,
the employer's failure to adhere to established company policy, discriminatory treatment when
compared to similarly situated employees, [or] sudden and marked changes in an employee's
performance evaluations after a workers' compensation claim." 222 S.W.3d 368, 391 (Tenn. Ct.
App. 2006). The *Newcomb* plaintiff provided evidence that he was harassed about his injury,
including testimony that his supervisors were told to keep an eye on him and to look for an

excuse to fire him after he filed a workers' compensation claim. *Id.* at 391-92. The plaintiff also presented evidence that his employer failed to follow the process set out in the company handbook for enforcing company policy. *Id.* at 394-95.

Temporal proximity may also serve as evidence of causation if the plaintiff's prior job performance was otherwise satisfactory. *See Conatser*, 920 S.W.2d at 648. The court reversed summary judgment for the defendant in *Smith v. Bridgestone/Firestone, Inc.*, in which the plaintiff was fired three weeks after filing a workers' compensation claim for allegedly violating plant policy, in part because the plaintiff had never before violated plant policy or been disciplined. 2 S.W.3d 197, 198-99 (Tenn. Ct. App. 1999). By contrast, the court in *Birchett v. Nashville Co.* held that a plaintiff who had been fired two weeks after filing a workers' compensation claim did not prove a causal connection because she had also missed 32 days of work in the previous two months. No. M1999-00207-COA-R3-CV, 2000 WL 640895, at *3 (Tenn. Ct. App. May 19, 2000). Even though the plaintiff had worked for the defendant for 30 years, the court found that the 32 missed days were "overwhelming evidence that plaintiff was not performing her job satisfactorily." *Id.*

The court in *Newcomb* also suggested that evidence that the defendant's stated reason for firing a plaintiff was false can establish cause. 222 S.W.3d at 391; *see also Bennett v. ERMCO Components, Inc.*, No. 07-2305, 2008 WL 867894, at *3-4 (W.D. Tenn. Mar. 28, 2008). In *Bennett*, the defendant company claimed to have fired the plaintiff for lying about a prison record rather than for filing a workers' compensation claim, but the plaintiff provided evidence that the company knew about his record when he was hired. *Id.* at *4. Likewise, the defendant in *Bridgestone/Firestone* stated that it fired the plaintiff because he violated plant policy by leaving the premises during the work day, but the parties disputed whether the alleged violation had even

20

occurred. 2 S.W.3d at 204. The plaintiff also presented evidence that his manager had never before fired an employee for leaving the premises. *Id.*

Without additional evidence, an employee's subjective belief or speculation that a causal connection exists will not defeat summary judgment. *Reed*, 4 S.W.3d at 685. Rather, a plaintiff must present evidence that is sufficiently compelling to support an inference of retaliation. *Id.* at 686. In *Reed*, the plaintiff testified that she "believe[d] in [her] heart" that she was fired for filing a workers' compensation claim. *Id.* at 685. The court found this evidence to be insufficient. *Id.* at 686.

Young fails to provide evidence that a causal connection exists between his claim for workers' compensation and UPS's decision to terminate him. He primarily relies on the temporal proximity between his filing of a claim for workers' compensation in December 2010 and his termination in March 2011. However, even taking the facts in the light most favorable to Young, the chronology of his performance issues at UPS undercuts his claim that his workers' compensation claim was a substantial factor in his termination. It is undisputed that Young was placed on a performance improvement plan five months prior to his injury, and, therefore, Young's performance prior to his workers' compensation plan was not satisfactory.

Young also unpersuasively argues that his discharge was retaliatory because Simmons and Cacho "failed to take his [head injury] seriously," pointing to testimony from both supervisors that described Young's injury as a "bump on the head." Such statements do not rise anywhere near a level of harassment and do not constitute evidence that UPS was looking for a way to terminate Young following his injury and workers' compensation claim. Additionally, there is ample testimony in the record from other employees, including Maxson, that Young's poor performance was an issue months prior to his workers' compensation claim. Finally, if

21

anything, the extension of Young's MPIP following his injury indicates that UPS actively attempted to maintain his employment and terminated Young as a last resort after his performance failed to improve.

Young has submitted no compelling evidence that his workers' compensation claim was a substantial factor in his termination. Accordingly, Young has failed to state a *prima facie* claim for retaliation and summary judgment in favor of UPS is appropriate.

## V.  <u>Disability Discrimination Claims[9]</u>

The ADA protects disabled employees and job applicants from discriminatory treatment. *See* 42 U.S.C. § 12112(a). Under the ADA, no covered entity shall discriminate against a qualified individual with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. *Id.* Discrimination under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* at § 12112(b)(5)(A); *see Kleiber v. Honda of Amer. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). The parties agree that Young is pursuing two theories of liability under the ADA: (1) discriminatory discharge; and (2) a failure to accommodate.

_____

[9] Although the Amended Complaint includes a disability claim under the Tennessee Human Rights Act, T.C.A. § 4-21-101 *et seq.* ("THRA"), the plaintiff does not address the THRA in his brief. Accordingly, the court considers the plaintiff's THRA disability claim to be abandoned.

It is well-settled that two different standards apply to Young's two claims. Discriminatory discharge claims under the ADA and the TDA[10] based on indirect, rather than direct, evidence are subject to the familiar *McDonnell Douglas* burden-shifting analysis. *Whitfield v. Tennessee*, 639 F.3d 253, 256 (6th Cir. 2011); *see also* T.C.A. § 4-21-311 (directing that claims under the Tennessee Disability Act should be analyzed in civil cases using a standard identical to the *McDonnell Douglas* burden shifting analysis). On the other hand, "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence" of an employer's failure to accommodate. *Kleiber*, 485 F.3d at 868; *see also Cash v. Siegel-Robert, Inc.*, --- F. App'x ---, 2013 WL 6231791 (6th Cir. Dec. 3, 2013).

## A. Discriminatory Discharge

To set forth a *prima facie* case of employment discrimination under the ADA, the plaintiff must show (1) that he was "disabled" within the meaning of the ADA; (2) that he was qualified to perform the requirements of the job with or without reasonable accommodation; (3) that he was discriminated against *solely* because of the disability. *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1105 (6th Cir. 2008) (emphasis added).

UPS argues that Young has not shown that he was "disabled" within the meaning of the ADA. An individual is considered disabled under the ADA if he has (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by his employer as having such an impairment. *Id.* at 1105 (citing *Gruener v. Ohio Casualty Ins. Co.*, 510 F.3d 661, 664 (6th Cir.

---

[10] As an initial matter, the parties appear to agree that the plaintiff's ADA and TDA discriminatory discharge claims should be evaluated under the same standard. (*See* Docket No. 22 at 12-13; Docket No. 38 at 15-17.)

2008)).  The Supreme Court has held that there are two ways in which individuals may fall

within the "regarded-as-disabled" statutory definition.  It applies when:

> (1) a covered entity mistakenly believes that a person has a physical impairment
>     that substantially limits one or more major life activities, or

> (2) a covered entity mistakenly believes that an actual, non-limiting impairment
>     substantially limits one or more major life activities. In both cases, it is
>     necessary that a covered entity entertain misperceptions about the
>     individual—it must believe either that one has a substantially limiting
>     impairment that one does not have or that one has a substantially limiting
>     impairment when, in fact, the impairment is not so limiting.

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) (quoting *Sutton v. United Air*

*Lines, Inc.*, 527 U.S. 471, 489 (1999)).  "Thus, an individual may fall into the definition of one

regarded as having a disability if an employer ascribes to that individual an inability to perform

the functions of a job because of a medical condition when, in fact, the individual is perfectly

able to meet the job's duties."  *Id.*

1.  <u>"Regarded As"</u>

Young contends that he was "regarded as" disabled by UPS because, after his injury in

December 2010, he was unable to perform the same job due to his physical limitations.  To

demonstrate that UPS considered Young disabled, Young must show that UPS ascribed to

Young an inability to perform the functions of his job when, in fact, Young was perfectly able to

meet the job's duties.

Young makes no such allegation.  Instead, Young appears to submit that UPS "regarded"

Young as disabled because UPS accommodated Young's physician-ordered restrictions

following his December 2010 injury.  Young relies on Simmons' testimony in a hearing before

the Tennessee Department of Labor ("Unemployment Hearing") to demonstrate that UPS and

Simmons were aware of Young's injury and permitted Young to reduce his job duties, such as

24

heavy lifting, in accordance with the temporary restrictions prescribed by Young's physician following his December injury.[11]  (*See* Docket No. 32.)  Young argues that, because Simmons testified that Young was unable to perform his typical job duties between December 2010 and his termination in March 2011, that he has demonstrated that UPS regarded Young as disabled and, therefore, has set forth a *prima facie* case for disability discrimination.

Young's arguments are without merit because he ignores the settled law as to the "regarded as" statutory definition.  At most, Young has demonstrated that UPS honored Young's medical restrictions and, accordingly, limited his job duties following a job injury.  He has not established that UPS "ascribed to Young an inability to perform the functions of his job when, in fact," Young was able to perform his job.  On the contrary, Young testified that he was incapable of performing some of his job duties without headaches and adverse symptoms because of his December injury.  Accordingly, Young has failed to meet the burden of demonstrating that he is disabled pursuant to the ADA and UPS is entitled to summary judgment.[12]

---

[11] In the hearing, Simmons explained his understanding of the chronology of Young's termination.  Simmons appears to submit that, as of the fourth review of Young's MPIP, dated December 4, 2010, Simmons and Cacho had determined that Young should be terminated and recommended such action to the Human Resources Department.  (Docket No. 32 at 49-52.) When asked why UPS waited until March 2011 to terminate Young, Simmons testified that it was his "speculation" that "HR was reviewing" the recommendation to fire Young made in October and December 2010 and, because Robert was frequently absent following his injury in December, the termination meeting did not take place until March.  (*Id.* at 51.)  Simmons further testified that, following Young's injury in December, Young maintained his formal title as warehouse supervisor but did not perform the duties of a supervisor due to his physical restrictions.  Simmons appears to suggest that, due to these physical limitations, Simmons did not evaluate Young's performance after his December injury because Young was not performing the same job duties that fell under the criteria of his prior MPIP evaluations.  (*Id.*)

[12] Because the court concludes that Young has failed to demonstrate that he is disabled under the ADA, the court need not reach UPS's argument that Young has failed to demonstrate pretext. Even assuming *arguendo* that Young had successfully set forth a *prima facie* case for disability

**B. Reasonable Accommodation**

To establish a failure to accommodate claim under the ADA, Young has the burden to show that (1) he is disabled within the meaning of the ADA and (2) he is otherwise qualified for the position he holds or desires, despite his disability, "(a) without accommodation from the employers; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *See Cash*, 2013 WL 6231791, at *4 (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)). If Young meets this burden, UPS bears "the burden of proving that a challenged job criterion is essential, and therefore a business necessity," or that a proposed accommodation would impose an undue hardship on UPS. *Id.*

As an initial matter, for the reasons discussed in the above analysis of Young's discriminatory discharge claim, Young has failed to demonstrate that he is disabled within the meaning of the ADA and, therefore, his failure to accommodate claim must fail. However, even if Young had demonstrated that he was disabled under the ADA, his claim lacks support because he has presented no evidence that he asked UPS to grant him a reasonable accommodation to return to his job in an office position. *See id.*; *see also Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). In his deposition, Young appears to confuse a request for accommodation under the ADA with UPS's recognition of temporary restrictions prescribed by Young's physician. Despite this confusion, Young was unable to testify that he had ever submitted a request for accommodation under the ADA. (*See* Docket No. 21, Ex. 3 at 242-244.)

---

discrimination, however, Young's claim would fail for substantially the same reasons as his FMLA retaliation claim, because he fails to demonstrate a genuine issue of material fact as to pretext.

26

Finally, even assuming *arguendo* that Young had demonstrated that he was disabled under the ADA and that he had made a request to UPS for accommodation of his disability, Young does not argue that he could return to his job without a reasonable accommodation. An employee who contends that he is otherwise qualified with a reasonable accommodation bears the initial burden to propose an accommodation and show that the accommodation is objectively reasonable. *See Kleiber*, 485 F.3d at 870. If the requested accommodation is a job transfer, the employer has a duty to locate a suitable position for the employee with a disability. *Id.* Nonetheless, to overcome summary judgment, Young must "identify the specific job he seeks" and "demonstrate that he is qualified for that position."

In sum, Young fails to demonstrate that (1) he is disabled under the ADA; (2) he requested a reasonable accommodation that would allow him to return to his job; and (3) had he requested a reasonable accommodation, that he met his burden to propose a specific and reasonable accommodation. Young has not produced sufficient evidence to reach the jury with his claim that UPS failed to grant him a reasonable accommodation under the ADA. Accordingly, summary judgment is appropriate for UPS as to Young's failure to accommodate claim.

## VI.     Title VII Race Discrimination Claim

Young alleges that UPS discriminated against him on the basis of race in violation of Title VII and the THRA. The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims. *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 880 n.1 (6th Cir. 2008). In order to establish a *prima facie* case for a Title VII employment discrimination claim, "a plaintiff must either present direct evidence of discrimination or introduce

27

circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.,* 319 F.3d 858, 864–65 (6th Cir. 2003).

### A.  Indirect Evidence of Discrimination

Because Young has failed to present any direct evidence of discrimination, the burden-shifting approach first set forth in *McDonnell Douglas* applies to his Title VII claim.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).  Young must first produce evidence to establish a *prima facie* case of racial discrimination.  *Caterpillar*, 496 F.3d at 593.  To do so, he must demonstrate that (1) he is a member of a protected class; (2) he was qualified for [his] position; (3) he was subject to an adverse employment action; and (4) he was treated differently than [similarly situated] employees outside the protected class for the same or similar conduct. *Id.*

### B.  Young's Title VII *Prima Facie* Case

The parties dispute the fourth element of Young's claim.  As with his FMLA retaliation claim, Young asserts that he was treated differently than similarly situated non-minority employees—specifically, Maxson and Stutesman.  For instance, Young submits that, on several occasions, Simmons "requested write-ups from Young" that more appropriately were assigned to Caucasian employees.  (Docket No. 38 at 22.)  The court has already rejected Young's assertion that Maxson and Stutesman were "similarly situated" to Young for purposes of demonstrating a *prima facie* case of discrimination because the record demonstrates that both Maxson and Stutesman showed improvement following errors or criticisms from their supervisors. Moreover, Young's conclusory allegations—based entirely on his own speculation and self-serving testimony—are insufficient to demonstrate any genuine issue of material fact as to whether he was treated dissimilarly from white, similarly situated comparators (had he

28

successfully provided any to the court). For substantially the same reasons that Young fails to demonstrate pretext as to his FMLA retaliation claim, Young has failed to demonstrate that he was treated differently than similarly situated non-minority employees and, therefore, he fails to make out a *prima facie* case for race discrimination. Accordingly, his Title VII and THRA claims cannot survive summary judgment.

**VII.      Safety Violation Retaliation**

Young's whistleblower claims under the TPPA, T.C.A. § 50-1-304, and common law are also insufficient to survive UPS's summary judgment motion. Both claims relate to Young's allegations that he reported an uncovered bolt in a restricted area path in the warehouse after hitting his head on or near the bolt.

**A.  TPPA**

The TPPA creates a cause of action for retaliatory discharge by providing that "no employee shall be discharged or terminated solely for refusing to participate in, or refusing to remain silent about, illegal activities." § 50-1-304(b); *id.* § 50-1-304(d)(1). The TPPA defines "illegal activities" as "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety, or welfare." *Id.* § 50-1-304(c). To set forth a valid claim under the TPPA, a claimant bears the burden of proving the following four elements:

> (1) the plaintiff was an employee of the defendant;
> (2) the plaintiff refused to participate in or remain silent about illegal activity;
> (3) the defendant employer discharged or terminated the plaintiff's employment; and
> (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

29

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437 (Tenn. 2011); *Sykes v. Chattanooga Hous. Auth.,* 343 S.W.3d 18, 27 (Tenn. 2011); *see also Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528 (Tenn. 2002); *Voss v. Shelter Mut. Ins. Co.,* 958 S.W.2d 342, 344 (Tenn. Ct. App. 1997).

### B. Common Law Retaliatory Discharge

Young's common law retaliatory discharge claim requires him to prove:

(1) that an employment-at-will relationship existed;
(2) that the employee was discharged;
(3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and
(4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437-38 (Tenn. 2011)

(citing *Kinsler v. Berkline, LLC,* 320 S.W.3d 796, 800 (Tenn. 2010)).

As an initial matter, courts often analyze statutory and common law whistleblower claims together. *Smith v. C.R. Bard, Inc.*, 730 F. Supp. 2d 783, 796-97 (M.D. Tenn. 2010); *see also Bright v. MMS Knoxville, Inc.*, No. M2005-2668-COA-R3-CV, 2007 WL 2262018, at *3 (Tenn. Ct. App. Aug. 7, 2007). The first three elements of the statutory discharge claim are identical to the elements of the common law claim; however, the fourth element differs in that, to benefit from protection of the TPPA, the employee must demonstrate that his refusal was the sole reason for his discharge. *Bright*, 2007 WL 2262018, at *3.

In analyzing a whistleblower case, a court is not limited to a determination of whether a law or regulation was violated, and, indeed, an employee's actions will not qualify him or her for protection merely because the employee has pointed out an illegal activity. *Id.* (citing *Franklin*

30

*v. Swift Transp. Co.*, 210 S.W.3d 521, 530-31 (Tenn. Ct. App. 2006)).  It is the court's task to determine whether the whistleblowing activity that brought to light an illegal or unsafe practice has furthered an important public policy interest.  *Bright*, 2007 WL 2262018, at *3 (citing *Guy*, 79 S.W.3d at 538).  To that end, it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest.  *Id.*  Furthermore, while an employee need not report suspected illegal activities directly to law or regulatory enforcement officials, an employee must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities.  *Id.*; *see also Smith*, 730 F. Supp. 2d at 797.

### C.  Young's Whistleblower Claims

UPS argues that Young's claim is insufficient because his alleged safety report does not relate to illegal activities.  The Supreme Court of Tennessee has instructed that, under both the TPPA and common law retaliatory discharge claims, the plaintiff must assert that his whistleblowing activity "serves a public purpose that should be protected.  So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged."  *Guy*, 79 S.W.3d at 537 n.4.  Besides Young's own conclusory assertion that his safety report was intended to "serve a public purpose," Young has failed to point to any specific public interest intended to be protected by his report of the exposed bolt.  Without more, he has failed to demonstrate that his safety violation was intended to further the public good and consequently, he fails to state a claim under the TPPA and common law.

Even assuming that Young had filed an appropriate safety report that would support his claim under the TPPA and the common law retaliatory discharge claim, Young has similarly

31

failed to demonstrate that his report of the safety violation was the *sole* reason for his termination, as required by the TPPA, or that his report was a substantial factor in his termination.  Accordingly, summary judgment in favor of UPS is appropriate for Young's whistleblower claims.

## VIII.      <u>Negligence</u>

Young's final claim alleges the common law negligence of UPS in hiring, supervising, and retaining Simmons, Young's alleged discriminatory perpetrator.

As an initial matter, UPS has argued that Young's state law negligence claim is barred by the exclusive remedy rule found in the Tennessee Workers' Compensation Act, T.C.A. § 50-6-108(a) (1999) ("TWCA").  The section reads:

> Right to compensation exclusive.—(a) The rights and remedies herein granted to an employee subject to the Workers' Compensation Law on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of such employee, such employee's personal representative, dependents or next of kin, at common law or otherwise, on account of such injury or death.

T.C.A. § 50–6–108(a).  Pursuant to this section, workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury. *Liberty Mut. Ins. Co. v. Stevenson,* 368 S.W.2d 760 (Tenn. 1963); *see Valencia v. Freeland & Lemm Constr. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003).  As have other jurisdictions, Tennessee courts have created an exception to the exclusivity provision for intentional torts committed by an employer against an employee; these torts give rise to a common law tort action for damages. *Valencia*, 108 S.W.3d at 242.

32

Indeed, where there is no allegation of intentional misconduct or an "actual intent to injure," Tennessee courts have dismissed negligent supervision and retention claims, citing the exclusivity provisions of the workers' compensation law. *See Bellomy v. Autozone, Inc.*, No. E2009-00351-COA-R3-CV, 2009 WL 4059158, at *2, *10-11 (Tenn. Ct. App. Nov. 24, 2009) (affirming trial court's conclusion that the TWCA barred a plaintiff's negligent supervision and retention and negligent infliction of emotional distress claims against her employer arising out of gender discrimination perpetrated by her direct supervisor); *see also Leu v. Embraer Aircraft Maint. Servs., Inc.*, No. 3:10-0322, 2011 WL 1337405, at *7 (Apr. 7, 2011).

Alternatively, UPS argues that the plaintiff's claim fails because, in order to establish a negligence claim in this context, the plaintiff must show the employer's "knowledge of the employee's unfitness for the job," with the crucial issue being whether the perpetrator's conduct was "foreseeable" to the employer. *Doe v. Catholic Bishop for Diocese of Memphis*, 306 S.W.3d 712, 717 (W.D. Tenn. 2008) (assessing claims of church congregant against diocese related to negligent retention of priests accused of molestation).

Young provides no substantive challenge to the TWCA argument or any support for the notion that the misconduct alleged here was, in any way, foreseeable. Additionally, there is nothing in the record, other than Young's self-serving allegations, to support his contention that Cacho, Wilson, or UPS had knowledge that Simmons was unfit as a supervisor. For all these reasons, the defendant is entitled to summary judgment on Young's negligence claim as well.

## **CONCLUSION**

For the reasons stated herein, UPS's Motion for Summary Judgment on all claims by Young will be granted.

An appropriate order will enter.

33

ALETA A. TRAUGER
United States District Judge

34